[1] A New Orleans shoring company, founded in 1953, incorporated in 1963, and doing business in New Orleans continuously during that time, contracted with plaintiffs to jack and level their home. Plaintiffs sued for damages after the slab and some of the walls cracked when the house was being jacked. One and one-half years after the lawsuit was filed, the corporation filed for bankruptcy, whereupon plaintiffs amended their petition to add as defendants the two shareholders and the majority shareholder's son who helped run the business. The district court rendered judgment for $51,000 against the majority shareholder and his son while dismissing claims against the second shareholder, the separated wife, after "piercing the corporate veil" and finding damages arising out of deficient performance of the contract. The court of appeal exonerated the son because he was neither a director nor shareholder of the corporation, but affirmed judgment against the majority shareholder individually.
[2] We granted writs to consider whether the law limiting the liability of corporate shareholders has been properly applied. For the reasons which follow, we determine *West Page 1166 
that it has not. Plaintiff is entitled to judgment against the corporation with which they contracted, but not against the majority shareholder personally.
[3] Dixie Shoring was one of the oldest shoring companies in New Orleans, having been founded by O.P. Bajoie's father, Woodrow Walker, around 1953. From its founding through 1987, the business operated continuously, providing shoring services throughout the city. In May of 1963, the company incorporated in accordance with the corporation laws of Louisiana. The corporation did business under that name for an additional twenty-three years, through 1986, maintained checking accounts at Hibernia and First National Bank of Commerce in the corporate name, had gross receipts in excess of a quarter million dollars in each of the years 1985 and 1986, and filed appropriate tax returns with the Internal Revenue Service, the Louisiana Department of Revenue and Taxation, and the Louisiana Office of Employment Security. O.P. Bajoie and his son, Reginald, met regularly about the business operations.
[4] In November of 1985, William and Patricia Riggins contracted with Dixie Shoring Company, Inc. to have their home jacked and leveled. The south side of the house had sunk slightly, apparently because of ground subsidence in the area. O.P. Bajoie, who represented himself as the owner and president of Dixie Shoring Company, Inc., negotiated and signed the contract for his corporation after several meetings with Riggins. The amount of the contract was $9,100.
[5] Work began on the house November 18, 1985.[1] At the time of the first payment, O.P. Bajoie asked that the check be made out to himself personally instead of to Dixie Shoring Company, Inc. In December, O.P. Bajoie's son, Reginald, approached Riggins for the second payment and he also requested that the check be made out to him personally instead of to the company. Although Riggins refused to do this until he had the permission of O.P., he ultimately did make the second check payable to Reginald. Both O.P. and Reginald Bajoie testified that they requested the checks be issued in this manner to enable them more readily to cash the checks and use the money for necessary company expenditures.
[6] In January, 1986, after the jacking caused a major crack in the foundation with concomitant cracks in the interior and exterior walls of the house, plaintiffs refused to pay the final installment, and in April of 1986 initiated this suit to recover damages.
[7] Initially, the plaintiffs named only Dixie Shoring Company, Inc. as defendant in the action. However, according to the court of appeal (supported by the testimony of plaintiff), it was one and one-half years after plaintiffs filed suit that the corporation filed for bankruptcy, and shortly thereafter that plaintiffs amended their petition to bring in O.P. and Reginald Bajoie as individual defendants. Later, they filed a second supplemental and amending petition naming as another defendant Julie Bajoie, the former wife of of O.P. Bajoie and allegedly a shareholder of the company at the time the contract was executed.
[8] After a trial on the merits, the district court dismissed the plaintiffs' claims against Julie Bajoie. Additionally, the court "pierced the corporate veil" of Dixie Shoring Company, Inc., found both O.P. Bajoie and Reginald Bajoie personally liable, and awarded plaintiffs $51,000 in damages for the negligent and improper levelling of their house. The judgment is silent concerning the corporation. However, the plaintiffs' claims, and prayer for monetary relief against Dixie Shoring Company, Inc., was not eliminated in their supplemental petitions adding the three defendants.
[9] In its reasons for judgment, the district court found that several factors supported ignoring the corporate existence: 1) employees being paid in cash with no records maintained of this; 2) checks from customers of the business that were made out to *West Page 1167 
O.P. and Reginald Bajoie individually instead of to the corporation; 3) no corporate minutes kept; 4) property belonging to O.P. Bajoie individually was used by the corporation without compensation to O.P.; 5) over $100,000 disappeared without explanation between the end of 1986 and the filing of the bankruptcy petition; 6) some of the same equipment used by the corporation is now being used by the successor business, including a truck titled in the name of the former corporation; 7) disbursements made to employees without complete documentation; 8) failure to show that the cash received by cashing the checks made out to the Bajoies individually was deposited into the corporate accounts; and 9) inexact testimony by O.P. and Reginald about how cash was handled.
[10] The district court also found facts which suggested that the corporate veil should not be pierced: 1) for many years the corporation operated under the corporate name; 2) the corporation maintained checking accounts and filed the appropriate tax returns under the corporate name; 3) the corporation showed profits and paid federal income taxes; 4) the plaintiff testified that he understood that he was dealing with the corporate entity and not O.P. and Reginald individually; 5) O.P. held informal meetings with Reginald about business operations which amounted to a form of Board of Directors meetings; 6) the corporation was properly incorporated under the laws of Louisiana; 7) the corporation had gross receipts of $280,403 in 1985 and $251,963 in 1986; 8) corporate checking accounts were maintained from which significant corporate disbursements were made; and 9) substantial sums of money were maintained in the corporate checking accounts during the time that work was being performed on plaintiff's house.
[11] Furthermore, the district court found that Reginald acted "beyond a mere employee of [the corporation] and acted personally and periodically as [its] alter ego." The court also found that both O.P. and Reginald Bajoie converted corporate funds to their own use. The only possible support in this record for that conclusion is the evidence regarding the two checks made payable to O.P. and Reginald Bajoie and cashed by them. The district court concluded that "[t]he totality of the testimony, documentary evidence and pleadings" established that the corporate veil should be pierced. It awarded plaintiffs $51,000 in damages and held both O.P. and Reginald Bajoie personally liable for deficient performance under the contract. The court found that the jacking was negligently performed, in violation of the "implied warranty" inherent in all contracts. The court noted that the 5th and 6th factors given for ignoring the corporate existence were the most damaging (the trial judge said they "tipped the scales") and resulted in the imposition of liability upon O.P. Bajoie and Reginald Bajoie individually. Factors 5 and 6 are: "(5) In excess of $100,000 of corporate . . . assets disappeared . . . prior to bankruptcy" and "(6) . . . equipment formerly used in [the corporation's] business is now used by [the successor business]."
[12] The court of appeal affirmed the district court's ruling that Dixie Shoring Company, Inc. was simply the alter ego of its major shareholder, O.P. Bajoie. However, the court of appeal reversed the portion of the district court's judgment holding the son, Reginald, individually liable because he was neither a director nor shareholder of the corporation. They affirmed the damage award of $51,000 against O.P. Bajoie for deficient performance under the contract.
[13] The general rule that corporations are distinct legal entities, separate from the individuals who comprise them, and that the shareholders are not liable for the debts of the corporation, is statutory in origin and well supported by the jurisprudence. LSA-R.S. 12:93(B); La.C.C. arts. 435, 436, 437;Buckeye Cotton Oil Company v. Amrhein, 168 La. 139,121 So. 602 (La. 1929); Johnson v. Kinchen, 160 So.2d 296
(La.App. 1st Cir. 1964). The economic purpose underlying this framework of limited liability was expressed by the First Circuit over a quarter century ago: "[P]rotection from individual liability encourages and promotes business . . . and industry . . . ." Id. at 299. Additionally, this *West Page 1168 
shareholder liability shield encourages business investments in high-risk areas by enabling investors who utilize the corporate form to make capital contributions to corporations while insulating their personal wealth from the risks inherent in business. Smith v. Cotton's Fleet Service, Inc.,500 So.2d 759 (La. 1987); Glazer v. Commission on Ethics forPublic Employees, 431 So.2d 752 (La. 1983); Johnson v.Kinchen, supra; Comment, Piercing the Corporate Veil inLouisiana, 22 Loy.L.Rev. 993, 994 (1976). No matter the size of the business, incorporation is an optional form for conducting business in Louisiana. In fact, the 1968 revision to the corporation laws now allow a single individual to incorporate. LSA-R.S. 12:21.
[14] Because of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances. Johnson v.Kinchen, supra. Moreover, if the plaintiffs do not allege shareholder fraud, they bear a heavy burden of proving that the shareholders disregarded the corporate entity to such an extent that it ceased to become distinguishable from themselves.Chaney v. Godfrey, 535 So.2d 918 (La.App. 2d Cir. 1988);American Bank of Welch v. Smith Aviation, Inc.,433 So.2d 750 (La.App. 3d Cir. 1983).
[15] There are limited exceptions to the rule of non-liability of shareholders for the debts of a corporation, where the court may ignore the corporate fiction and hold the individual shareholders liable. Generally, that is done where the corporation is found to be simply the "alter ego" of the shareholder. It usually involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation. LSA-R.S. 12:95; Dillman v. Nobles,351 So.2d 210 (La.App. 4th Cir. 1977); Bossier Millwork SupplyCo. v. D. R. Const. Co., Inc., 245 So.2d 414 (La.App. 2d Cir. 1971). Another basis for piercing the corporate veil is when the shareholders disregard the requisite corporate formalities to the extent that the corporation ceases to be distinguishable from its shareholders. Gordon v. Baton Rouge Stores Co.,168 La. 248, 121 So. 759 (La. 1929); Cahn Elec. Appliance Co. v.Harper, 430 So.2d 143 (La.App. 2d Cir. 1983); Dillman v.Nobles, supra; Brown v. Benton Creosoting Co., 147 So.2d 89
(La.App. 2d Cir. 1962).
[16] Some of the factors courts consider when determining whether to apply the alter ego doctrine include, but are not limited to: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings.Kingsman Enterprises v. Bakerfield Elec. Co., 339 So.2d 1280
(La.App. 1st Cir. 1976); Smith-Hearron v. Frazier,Inc., 352 So.2d 263 (La.App. 2d Cir. 1977), writdenied, 353 So.2d 1337 (La. 1978).
[17] The fact that one individual owns a majority of stock in the corporation does not in itself make that individual liable for corporate debts. LSA-R.S. 12:21; Byles Welding andTractor v. Butts Sales, 541 So.2d 992 (La.App. 3d Cir. 1989);Texas Industries v. Dupuy Dupuy Develop., 227 So.2d 265
(La.App. 2d Cir. 1969). This is particularly true in the case of a closely held corporation where often corporate business is conducted by the majority, or sole, stockholder.
[18] Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing. LSA-R.S. 12:93(B), 12:95; Deroche v. P L Const. Materials, Inc., 554 So.2d 717 (La.App. 5th Cir. 1989); Hemphill-Kunstler-Buhler, Auctioneers andAppraisers v. Davis Wholesale Elec., 516 So.2d 402 (La.App. 1st Cir. 1987); Lone Star Industries, Inc. v. AmericanChemical, Inc., 461 So.2d 1063 (La.App. 4th Cir. 1984),writ denied, 465 So.2d 738 (La. 1985), aff'd,480 So.2d 730 (La. 1986), aff'd on rehearing, 491 So.2d 1333
(La. 1986). Generally, unless the directors or officers of a corporation purport to bind themselves individually, they *West Page 1169 
do not incur personal liability for debts of the corporation. L.L.Ridgway Co. v. Marks, 146 So.2d 61 (La.App. 4th Cir. 1962). Furthermore, corporate agents are generally not liable for corporate debts and the burden of establishing the contrary is on the corporate creditor. Bricks Unlimited, Inc. v. LemoineHomes, Inc., 380 So.2d 714 (La.App. 4th Cir. 1980).
[19] When a party seeks to pierce the corporate veil, the totality of the circumstances is determinative. Harris v.Best of America, Inc., 466 So.2d 1309 (La.App. 1st Cir. 1985); Liberto v. Villard, 386 So.2d 930 (La.App. 3d Cir. 1980); Smith-Hearron v. Frazier, Inc., supra. In order properly to disregard the corporate entity, one of the primary components which justifies piercing the veil is often present: to prevent the use of the corporate form in the defrauding of creditors. Liberto v. Villard, supra.
[20] There is no evidence that Bajoie used the corporate form to perpetrate fraud. Indeed, the plaintiffs have not asserted fraud in their pleadings. Possibly that is because, among other reasons, Bajoie had been operating this shoring business for at least twenty-three years, using the corporate form consistently. Although some of the corporate formalities were not strictly followed, such as formal Board of Director's meetings, the Bajoies did follow most of the essential corporate formalities for the twenty-three years of the corporation's existence, such as having corporate bank accounts and filing corporate tax returns, etc. Moreover, in the cases where they did not strictly follow certain formalities, as in the example above concerning the lack of formal Board meetings, O.P. and Reginald still ran the corporation basically on a corporate footing; for example, they regularly met informally about business operations which, especially given that this was a small, closely held corporation, sufficed to satisfy the spirit of the requirement. See Chaneyv. Godfrey, supra. They routinely contracted in the name of the corporation (indeed, their contracts bear the corporate name) and did so with plaintiffs who understood and believed that they were doing business with the corporation. Riggins even filed suit initially against the corporation alone, and did not include the Bajoies individually until the corporation filed for bankruptcy.
[21] In support of piercing the corporate veil in order to allow casting O.P. Bajoie individually, the district court relied heavily on an alleged diversion of corporate assets prior to the filing of the petition in bankruptcy. Said the court (and quoted by the court of appeal):
[22] In excess of $100,000.00 of corporate . . . assets disappeared without explanation by OPB and RB between the end of [the corporation's] last fiscal year for tax purposes (1986) prior to bankruptcy and the date of the filing of the [corporation's] petition in bankruptcy.
[23] Riggins v. Dixie Shoring Co., Inc., 577 So.2d 1060, 1062 (La.App. 4th Cir. 1991).
[24] But the record does not support these conclusions, either that the corporation had over $100,000 in assets at the end of 1986, or that these assets disappeared from the corporation prior to filing for bankruptcy.
[25] The only record evidence regarding the existence of these assets is the listing of an "equipment" asset of $112,864 which appears on the corporation's December 31, 1986 balance sheet, is confirmed in a 12/31/86 general ledger and included in a 1986 federal tax return. That entry in each pertinent exhibit, however, is immediately followed by a debit entry for depreciation of $103,057.50, and a concluding entry, for the difference, of total fixed assets of $9,806.50. Similarly, a fixed asset entry of $800 (truck) is immediately followed by a corresponding $800 debit for depreciation. Thus, the machinery and equipment entry, no doubt corresponding to their undepreciated basis for tax purposes, at the end of 1986, on the balance sheet and the tax return, was $9,806. The equipment was thus depreciated just short of 90%, an indication that it was old equipment (probably accumulated over the twenty-three years of the corporation's existence). The cost, or other basis, at no doubt much earlier acquisition dates (dates are not shown in plaintiffs' exhibits), was presumably $112,864. The property may have been worth $9,806, *West Page 1170 
or less, or maybe more. The only specific evidence of value, however, was $1,800, which was placed on this asset in the bankruptcy schedule by the bankrupt corporation. There is no other evidence in the record of the value of this machinery and equipment.
[26] This $112,864 of equipment must necessarily be the "over $100,000" of corporate assets which the trial court found disappeared, or was illegally diverted, for there is no other evidence of this sort in the record. We have already, in the preceding paragraph, discussed the proof of value of this equipment. Regarding disappearance, the contrary seems evident from the scant evidence presented in the record. Over a year after plaintiff sued the Dixie Shoring Company, Inc. the latter filed for bankruptcy. Notably, they listed in a schedule of assets at that time not only $19,000 in deposits (i.e., bank balances) and over $40,000 in contingent and unliquidated claims, but machinery and equipment, which the debtor valued at $1,800, and a vehicle which was valued at $700.
[27] Furthermore, that some of the same equipment purportedly is being used by a successor business entity, including a truck titled in the name of the corporation, is not proof of any illegal diversion. Proper bankruptcy processes often result in a trustee's dispossessing himself of a bankrupt debtor's property.
[28] Corporations may invoke bankruptcy under Chapter 7 or Chapter 11. The implication in this case (again, the record evidence is scant) is that Dixie Shoring Company, Inc. filed under Chapter 7 because, from the testimony at trial, the Dixie Shoring Company, Inc. did not continue in operation.
[29] Pertinent to plaintiffs' contention (essentially a surmise) that assets were illegally diverted are some principles to be found in the bankruptcy law. Unlike individuals, corporations (which are allowed Chapter 7 relief) may not be discharged from their obligations through bankruptcy. 11 U.S.C.A. § 727(a)(1). Also, the bankruptcy of this corporation may or may not be closed, or have been closed when this case was tried. The bankruptcy court must close the case after full administration, but the case may be reopened to administer assets, to accord relief to the debtor, or for other reasons. 11 U.S.C.A. § 350. The trustee may abandon any property of the debtor that is burdensome or inconsequential to an estate. 11 U.S.C.A. § 554(a). Additionally, unless the court orders otherwise, any property not otherwise administered at the point where the case is closed is abandoned to the debtor. Id. at (c).
[30] Accordingly, any number of possibilities exist regarding the transition in ownership and/or control of the bankrupt's machinery and equipment. On the record presented in this case, including a Summary schedule which lists machinery and equipment, it is at least more likely than not that there has not been a diversion of these assets pre-bankruptcy or an illegal diversion post-bankruptcy, and certainly no disappearance of the machinery and equipment.
[31] If the trustee did abandon the machinery and equipment in this case, those movables likely remain with the bankrupt, Dixie Shoring Company, Inc., where they are still subject to seizure in execution of any judgment against that corporation. In the event that the trustee has not disposed of this property, or that the bankruptcy is still open, the assets of the debtor corporation remain titled in trust with the trustee. In any event, the bankruptcy summary schedule reflects that the machinery and equipment were declared in the bankruptcy proceedings, a fact which argues against the conclusion that they were illegally diverted. In fact, it is not at all evident, although possible, that the bankruptcy was initiated to escape payment of a prospective judgment in this case. The corporation did not file for bankruptcy until one and one-half years after plaintiffs' suit was filed and their declared assets ($67,000) were overshadowed by debts and claims of over a half million dollars.
[32] Another factor that the district court pointed to in deciding to pierce the corporate veil was the uncompensated use by the old corporation of certain land and tools owned by O.P. Bajoie personally. In his *West Page 1171 
testimony, O.P. Bajoie admitted letting the corporation use some personally-owned land and tools without compensation. These practices do not warrant a conclusion that the identities of the shoring corporation and Bajoie were merged when balanced against the Bajoies' other practices of operating this family business within the corporate form for twenty-three years.
[33] In a case with some facts similar to those in the instant case, Ceco Corp. v. R M Indus., Inc., 416 So.2d 166, 167 (La.App. 4th Cir. 1982), the court held that the president's decision to forego a salary or to make an interest-free loan to the corporation were not grounds for piercing the corporate veil. Similarly, the use of Bajoie's land and tools by the corporation without compensation is essentially an interest-free loan which does not constitute sufficient grounds for disregarding the corporate entity.
[34] The other infractions cited by the trial judge as ones which militated in favor of piercing the corporate shield are also less significant; for example, the failure to keep corporate minutes or maintain a cash journal. Although these facts indicate less than precise handling of corporate affairs, they do not thwart the basic requirement of maintaining a separate existence between the shareholders and the corporation when viewing the entire circumstances. In fact, the district court listed the same number of factors which it considered weighed against piercing the corporate veil as it listed in support of piercing. Some of these constitute essential corporate requirements, such as: proper incorporation; substantial profits; separate checking, accounting, and filing of tax returns; and a separate enough identity that customers, including the Riggins, knew that they were dealing with the corporate entity. Therefore, examining the totality of the circumstances before us, we conclude that the lower courts erred in piercing this corporation's shield.
[35] By disregarding the corporate form, the district judge essentially merged the entities of the corporation and the individuals. Then, having concluded that there should be individual responsibility for what it found to be a defectively performed job which resulted in damage, the district court neither rendered judgment for or against the corporation. We have found to the contrary by determining that the corporation was indeed a separate entity from the shareholders and by exonerating O.P. Bajoie from personal liability. It is only because of this court's determination that the entities are indeed separate that it becomes necessary to consider plaintiffs' claims against the corporation itself. We could remand to the district court to render judgment consistent with this opinion on plaintiffs' claims against the corporation. However, that would be an unnecessary and useless exercise. Inasmuch as the plaintiffs' claims were neither withdrawn nor dismissed, which asserted liability and sought relief in its prayer against the corporation, we will, on this record, render judgment in favor of the plaintiffs against Dixie Shoring Company, Inc.
[36] Whether the property is currently titled in trust with the trustee or has reverted to the corporation, the plaintiffs may still have the option of attempting to satisfy their judgment. The record does not indicate that Dixie Shoring Company, Inc. has been liquidated. And, the bankruptcy proceedings do not serve to discharge the corporation's debt. 11 U.S.C.A. § 727(a)(1).
[37] Plaintiffs have also made two alternate contentions beyond merely attempting to pierce the corporate veil in order to attach personal liability onto O.P. Bajoie. First, they assert that O.P. should be held liable based on his personal fault surrounding the damage-causing event (i.e., the negligent jacking) without disregarding the corporate entity. Second, they argue that the district court impliedly based its imposition of personal liability upon LSA-R.S. 12:92 and 12:93 which address unlawful distributions of corporate dividends and assets by directors, officers, shareholders, and subscribers.
[38] Regarding the first contention, the trial judge did not find that O.P. Bajoie was personally negligent. Nor do we. The instant case is, in this respect, similar to H.B. *West Page 1172 "Buster"Hughes, Inc. v. Bernard, 318 So.2d 9 (La. 1975), coincidentally also a corporation providing shoring services. In reversing, this court did not find tortious personal conduct on the part of the president and majority shareholder of that corporation, Sherman A. Bernard. Id. at 12. Essentially, the same reasoning was applied in that case as is in the instant case: Any fault on the part of the employee who was conducting the operations at the time damages were sustained is chargeable to his employer, the corporation, not to the president personally. Id. at 11.
[39] Regarding the second contention, that the district court impliedly based its imposition of personal liability upon LSA-R.S. 12:92 and 12:93, the best scenario supportive of plaintiffs' contention is that O.P. Bajoie received a $3,000 check as the first third of the total $9,000 job, cashed it and, contrary to his testimony, used it personally rather than for corporate or job expenses. The trial judge presumably accepted as true that O.P. Bajoie did divert that $3,000 to himself personally. He used this, among other reasons, for concluding that the corporate veil should be pierced, a matter which we have discussed at greater length hereinabove. However, he did not find personal liability on the strength of R.S. 12:92 and 12:93. Nor do we.
[40] These statutes are, for the most part, inapplicable to the situation involved here. The only close provision is in 12:92(D) which prohibits unlawful dividends or other distributions and exposes the recipient to the risk of liability in an amount equal to the amount of the unlawful distribution. O.P. Bajoie's possible personal diversion of $3,000 coincident with the commencement of work on the $9,000 contract probably does not qualify as the type of unlawful dividend or other distribution contemplated by 12:92(D).
[41] Furthermore, if the supposed conversion of corporate funds was a means of self-initiated dividend or profits distribution to this 98% shareholder, it probably was not unlawful; surely it would not have been an effort to defeat any claims by these plaintiffs who, at the time of Bajoie's cashing the personal check, did not yet have a damage claim against the corporation, much less any judgment.
[42] In summary, we find that the court of appeal erred in affirming the district court's judgment piercing the corporate veil of Dixie Shoring Company, Inc. and holding O.P. Bajoie personally liable for the damage award of $51,000.
[43] DECREE
[44] For the foregoing reasons, the judgment of the court of appeal holding O.P. Bajoie personally liable in the sum of $51,000 is reversed and set aside. There will be judgment herein in favor of William S. Riggins and Patricia G. Riggins and against Dixie Shoring Company, Inc. in the amount of $51,000 together with legal interest and all costs.
[45] REVERSED AND RENDERED.
[1] According to the contract, the plaintiffs agreed to pay Dixie in three installments: 1) at the beginning of the work; 2) when the house was ready to be levelled; and 3) upon completion of the job.